**Page 1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SANTOS CANALES ORTIZ          * CIVIL ACTION
VERSUS                        * NO. 08-3792
DILER DIS TERIET, A.S.        * SECTION I(2)
AND/OR YAZICI DEMIR CELIK     *
SANAYI VE TURIZM TIERET,      * JUDGE AFRICK
A.S.; ARCELOR INTERNATIONAL   *
AMERICA, LLC; AMERICAN        * MAG. WILKINSON
SHIPPING & CHARTERING; GREAT  *
CREATION, INC., As Owner of   *
the M/V GREAT CREATIONS,      *
and/or SINOTRANS SHIPPING,    *
LTD.; SVERIGES ANGFARTY'S     *
ASSURANS (THE SWEDISH CLUB    *
******************************

        Deposition of **SANTOS ANTONIO CANALES ORTIZ**
taken in the above-entitled cause before CATHY L.
LOGAN, a Certified Court Reporter, authorized to
administer oaths of witnesses, pursuant to Section
961.1 of Title 13 of the Louisiana Revised Statutes
of 1950, as amended, pursuant to the following
stipulation, given at the offices of LEGER & SHAW,
600 Carondelet Street, 9th Floor, New Orleans,
Louisiana 70130, on Friday, the 30th day of April,
2010.

**Page 2**

APPEARANCES:

REPRESENTING THE PLAINTIFF:

    LEGER & SHAW
    BY:  WALTER J. LEGER, III, ESQ.
         WALTER J. LEGER, JR., ESQ.
    600 Carondelet Street, 9th Floor
    New Orleans, Louisiana 70130
    Telephone: (504) 588-9043
    Facsimile: (504) 588-9980

REPRESENTING GREAT CREATION SHIPPING, LTD.,
SINOTRANS SHIPPING, LTD. AND SVERIGES ANGFARTYGS
ASSURANS FORENING (THE SWEDISH CLUB):

    PHELPS DUNBAR, L.L.P.
    BY:  KEVIN J. LaVIE, ESQ.
    365 Canal Street, Suite 2000
    New Orleans, Louisiana 70130-6534
    Telephone: (504) 566-1311
    Facsimile: (504) 568-9130

REPRESENTING ANCELOR INTERNATIONAL AMERICA:

    RAY, ROBINSON, CARLE & DAVIES, P.L.L.
    BY:  JULIA R. BROUHARD, ESQ.
    Corporate Plaza II, Suite 300
    6480 Rockside Woods Blvd., South
    Cleveland, Ohio 44131-2222
    Telephone: (216) 236-2400
    Facsimile: (216) 236-2409

**Page 3**

REPRESENTING AMERICAN LONGSHORE MUTUAL ASSOCIA

    BROWN SIMS
    BY:  THOMAS A. PORTEOUS, ESQ.
    650 Poydras Street, Suite 2200
    New Orleans, Louisiana 70130-6111
    Telephone: (504) 638-8472
    Facsimile: (504) 638-8473.

REPRESENTING AMERICAN SHIPPING & CHARTERING COR

    WAGNER & BAGOT
    BY:  C. GORDON STARLING, JR., ESQ.
    2660 Poydras Center
    650 Poydras Street
    New Orleans, Louisiana 70130
    Telephone: (504) 525-2141
    Facsimile: (504) 523-1587



EXHIBIT A

        Reported by CATHY L. LOGAN, Certified Court
Reporter in and for the State of Louisiana.

**Page 4**

                    STIPULATION

        IT IS STIPULATED AND AGREED by and among
counsel for the parties hereto that the deposition
of **SANTOS ANTONIO CANALES ORTIZ** may be taken fo
purposes permitted in accordance with the Federal
Rules of Civil Procedure, at the time and place
hereinabove recited;

        That all formalities are hereby specifically
waived;

        That all objections, save objections as to
the form of the question and responsiveness of the
answer, are reserved until such time as this
deposition, or any part thereof, is used or sought
to be used in evidence at the time of the trial of
the matter.

                    ..oOo..

        CATHY L. LOGAN, Certified Court Reporter in
and for the State of Louisiana, officiated in
administering the oath to the witness herein.

**25**

1  that's not in Chalmette but --
2       MR. LEGER, III:
3           Grand Isle is down --
4       THE WITNESS:
5           Down the road.
6       MR. LEGER, III:
7           Where did you live in 1998.
8       THE WITNESS:
9           I used to live on the boat.
10      Q. (BY MR. LaVIE) What was the name of the
11  boat?
12      A. I don't remember the name of the boat.
13      Q. You don't remember the name of the boat?
14      A. No.
15      Q. Sometimes they've got easy-to-remember names
16  so I thought you might remember.
17      A. No.
18      Q. All right. After you worked on this oyster
19  boat, where did you work?
20      A. In California.
21      Q. You went back to California?
22      A. No, no. I used to work in California. This
23  is my first job.
24      Q. Where did you work after that? What was
25  your next job in Louisiana?

**26**

1       A. I work in -- I stay in the warehouse. Work
2   in the appliance repair shop.
3       Q. Okay. That was the appliance repair shop in
4   Chalmette.
5       A. Uh-huh.
6       Q. And what type of appliances did you repair?
7       A. Dryers, washers.
8       Q. How did you know how to do that? How did
9   you learn how to do that?
10      A. See other people doing.
11      Q. Had you done that work before?
12      A. No.
13      Q. Where did you work after the appliance
14  repair shop?
15      A. On the river.
16      Q. As a stevedore?
17      A. Uh-huh.
18      Q. And who did you work for?
19      A. I worked for about three different company.
20      Q. Give me all those companies.
21      A. P & O.
22      Q. P & O Ports?
23      A. P & O Ports in New Orleans.
24      Q. Okay.
25      A. Coastal Cargo.

**27**

1       Q. Coastal Cargo. All right.
2       A. I worked for Pacorini, and a company I got
3   injured.
4       Q. Empire.
5       A. Empire.
6       Q. All right. Was the first company on the
7   river you worked for P & O?
8       A. Yes, sir.
9       Q. What did you do for them? Laborer?
10      A. Laborer.
11      Q. And what about Coastal Cargo? Laborer or --
12      A. Well, I be working back and forth. But the
13  first time I start like a laborer. When I learned
14  more things I used to do operator. Like a lift.
15      Q. Forklift operator?
16      A. Forklift operator.
17      Q. Crane operator?
18      A. No.
19      Q. So forklift operator.
20      A. Uh-huh.
21      Q. What about for Pacorini, what did you do for
22  them?
23      A. Same thing.
24      Q. Laborer?
25      A. Laborer, operator, whatever spot I can get,

**28**

1   you know.
2       Q. So for Pacorini you did laborer and forklift
3   operator?
4       A. Uh-huh.
5       Q. What about for Empire Stevedoring?
6       A. Same thing.
7       Q. Laborer?
8       A. Yeah. I got promoted to foreman.
9       Q. So forklift operator. Did you work as a
10  forklift operator at Empire?
11      A. Uh-huh.
12      Q. And then at some point you were promoted to
13  foreman?
14      A. Uh-huh.
15      Q. And that was a foreman of a gang?
16      A. Foreman of the gang.
17      Q. And that's a gang of laborers.
18      A. That's a gang of laborers.
19      Q. All right. When did you start working as a
20  foreman? How long before you got hurt?
21      A. About two and a half months.
22      Q. And who was your boss?
23      A. Frank.
24      Q. Frank?
25      A. Uh-huh.

29

1  Q. Is that his first name or last name?
2  A. That's the first name. That's the only I
3  know.
4  Q. And was he a ship superintendent or what was
5  his position?
6  A. The only thing I know is my boss. I don't
7  really know what is the title.
8  Q. Well, did he work on the ships with you when
9  cargo was being --
10 A. He do it all, you know. He got -- he on the
11 -- you know, he go to the ship or go whatever he
12 want to do.
13 Q. When you were working with -- hold on a
14 second. Let me just check. Do you have any type of
15 vocational training? Did you ever go to a vo-tech
16 school or a community college for any type training?
17 A. No, sir.
18 Q. Let's talk a little bit more about your work
19 as a foreman at Empire.
20 A. Uh-huh.
21 Q. What types of cargo did you work?
22 A. Anything come in the Port of New Orleans.
23 Q. And tell me some of the things that you
24 worked.
25 A. Wire rope. That's big bundles of wire.

30

1  Call it rebars. Ingots.
2  Q. Ingots?
3  A. Yeah.
4  Q. Okay.
5  A. Pipes.
6  Q. Pipes?
7  A. Uh-huh. Plywood. Rubber.
8  Q. Okay.
9  A. Containers.
10 Q. Okay.
11 A. Eighteen wheelers. You know, I mean --
12 Q. Look, I know these questions may seem kind
13 of silly, but, you know, we don't know what you do
14 and, you know, we just need to get a good idea of
15 your experience and what work you did. Well,
16 I mean, for example, you say you discharged
17 everything that came into the Port of New Orleans.
18 A. Uh-huh.
19 Q. You never discharged bulk cargos like grain
20 or sugar, did you?
21 A. Yeah.
22 Q. Sugar in bags or sugar --
23 A. Sugar containers. Containers.
24 Q. All right. How much of your work at Empire,
25 and I'm not talking just about your work as a

31

1  foreman, how much of your work at Empire for your
2  entire time there, how much of that involved steel?
3  Steel products?
4  A. Ninety-nine percent.
5  Q. And that was -- so ninety-nine percent of
6  your work at Empire was steel products?
7  A. Uh-huh.
8  Q. And that included wire rods, rebars, ingots,
9  pipes?
10 A. Pipes.
11 Q. Plates?
12 A. Plates. Copper.
13 Q. Copper. Okay. And bars?
14 A. Bars.
15 Q. And approximately how long were you working
16 at Empire before you were injured?
17 A. About five year.
18 Q. So for five years before you were injured
19 you worked at Empire and ninety-nine percent of your
20 work was steel.
21 A. Uh-huh.
22 Q. Tell me how many men were in a gang for
23 discharging Steel.
24 A. Twelve men.
25 Q. Okay. And that included the crane operator?

32

1  A. (Witness nods head affirmatively.)
2  Q. Forklift operator?
3  A. Uh-huh.
4  Q. When you're doing plates you don't need a
5  forklift operator, you need laborers. You can't
6  operate nothing.
7  A. Right. You can't move -- you can't move
8  it. The only operator you got is the crane operator
9  Q. Flagman?
10 A. Flagman, a hundred percent every time.
11 Q. How much money did you make per year working
12 for Empire?
13 A. I was supposed to make forty thousand
14 dollars guaranteed.
15 Q. Forty thousand?
16 A. Uh-huh. Seventeen dollars an hour.
17 Q. Did you actually make that?
18 A. I got injured.
19 Q. But as a foreman you were going to make
20 forty thousand?
21 A. Uh-huh. That way I don't have to do
22 overtime. That was only my guarantee.
23 Q. So you were going to get seventeen dollars
24 an hour?
25 A. Uh-huh.

**49**

1 over. Have you ever given a recorded statement to a
2 claims adjuster for the comp.?
3     A. No, sir.
4     Q. All right.
5     (Following a brief recess, the proceedings
6 continued.)
7     Q. (BY MR. LaVIE) Have you applied for Social
8 Security disability?
9     A. No, sir.
10     Q. Why not?
11     A. That was a good question. I don't really
12 know why.
13     Q. Do you have any income now other than the
14 five hundred twenty dollars a month from comp.?
15     A. The little money I used to have in savings.
16     Q. Okay. But I'm talking about income that
17 comes in every month.
18     A. No.
19     Q. Do you get any loans or money from your
20 attorneys?
21     A. Yes, sir.
22     Q. What do you get from your attorneys?
23     A. Loans.
24     Q. How much of a loan do you get?
25     A. About three hundred dollars a month

**50**

1 sometimes to pay my bills.
2     Q. Is that coming from Mr. Bouterie?
3     A. Yes, sir.
4     Q. Any other income?
5     A. No, sir.
6     Q. So you're getting the comp. and you're
7 getting the loan from Mr. Bouterie.
8     A. (Witness nods head affirmatively.)
9     Q. I kind of asked this before but let me
10 check. Does anyone live with you at this address
11 who shares expenses?
12     A. No.
13     Q. So you live alone?
14     A. Uh-huh.
15     (Discussion off the record.)
16     Q. (BY MR. LaVIE) When you worked as a foreman
17 did you fill in any paperwork for Empire?
18     A. No, sir.
19     Q. Who did the paperwork for the ships?
20     A. The clerk.
21     Q. The clerk. Okay. What about, tell me who
22 was above you in terms of working ships? Was there
23 anybody other than Frank?
24     A. Oh, yeah.
25     Q. Okay.

**51**

1     A. You got superintendents.
2     Q. You have ship superintendents?
3     A. No, you got company superintendents.
4     Q. They don't call them ship superintendents,
5 the guys who go out --
6     A. I don't know that, you know. I don't know
7 what the difference you call it are. I know it's a
8 superintendent.
9     Q. All right. Well, let's start talking about
10 your work on the GREAT CREATION when you got your
11 ankle hurt.
12     A. Uh-huh.
13     (Whereupon Mr. Leger, Jr. rejoined the
14 deposition.)
15     Q. (BY MR. LaVIE) Your accident occurred on
16 February 17th, 2006. Do you remember what day of
17 the week that was? Monday? Tuesday?
18     A. I think it was Monday.
19     Q. Okay. Well, let me ask it this way. How
20 many days were you working on the GREAT CREATION
21 before you had your accident?
22     A. At least three days before.
23     Q. And how many gangs were working, do you
24 remember?
25     A. At least two gangs.

**52**

1     Q. You were in charge of one gang?
2     A. Uh-huh.
3     Q. And there was a foreman for the other gang?
4     A. (Witness nods head affirmatively.)
5     Q. Do you remember his name?
6     A. No, sir.
7     Q. Then there was a superintendent, or was
8 there more than one?
9     A. More than one superintendent.
10     Q. Who was the superintendent for the GREAT
11 CREATION?
12     A. I think at that time Frank used to be the
13 superintendent on the only ship we had that day.
14     Q. You all only had one ship to work that day
15 --
16     A. Uh-hun.
17     Q. -- so Frank was working as the
18 superintendent?
19     A. Uh-huh.
20     Q. Who is Donny --
21     A. Nay (assumed spelling).
22     Q. I'm sorry, what?
23     A. Donny Nay?
24     Q. I can't read this last name.
25     A. It have to be one of those -- what you call

**77**

1  Q. Okay. Did you consider it dangerous to be
2  discharging this cargo with these wires?
3  A. I can't -- I don't know, because, you know,
4  I've been doing -- that was the only thing I know
5  how to do is that. I can't explain to you what's
6  danger, what is not danger, you know?
7  Q. Well, let me ask this. If a lot of the
8  bundles were breaking and falling, would you
9  consider that dangerous?
10  A. Oh, nobody probably want to do the job. The
11  rest of the employees don't want to deal with it.
12  This is not only by me, this has got people doing
13  the same kind of work.
14  Q. So while some bundles fell before your
15  accident, it wasn't so many bundles that you thought
16  it was really dangerous.
17  A. No.
18  Q. So even though every now and then a bundle
19  would break, you thought you if guys looked out for
20  the bundles, got out of the way from underneath the
21  load that this cargo could be discharged; is that
22  correct?
23  A. You're right.
24  Q. Did you ever talk with any -- the surveyor
25  about his thoughts about this cargo?

**78**

1  A. The superintendent talk -- do all the talk
2  with the surveyor. I don't got nothing to talk
3  about the surveyor. The surveyor talk to the
4  superintendent, the superintendent talk to me, I
5  talk to the rest of the laborers. That's the way it
6  goes.
7  Q. That's fine. So therefore you did not talk
8  to the surveyor.
9  A. You're right.
10  Q. Did you talk to anybody else about this
11  cargo other than your superintendent?
12  A. No, sir.
13  Q. Did you talk to your men about it?
14  A. Yes, sir.
15  Q. What did you tell them?
16  A. To heads up.
17  Q. I'm sorry, heads up?
18  A. Yeah.
19  Q. So you talked to your men about keeping
20  their heads up?
21  A. Keep their heads up.
22  Q. Being very careful.
23  A. Uh-huh.
24  Q. And you talked to the superintendent.
25  A. Uh-huh.

**79**

1  Q. And that's the only people you talked to
2  about this cargo.
3  A. The superintendent supposed to bring it down
4  to the ship people. He's supposed to be the one let
5  know any kind of situation you make with that, you
6  know what I mean?
7  Q. But you didn't talk to any of the ship's
8  crew, correct?
9  A. That's not my job.
10  Q. Did you talk to any member of the ship's
11  crew about the cargo?
12  A. No.
13  Q. Let me just be clear about this. It was you
14  guys, and by that I mean people from Empire, you
15  guys were discharging this cargo, correct?
16  A. Uh-huh.
17  Q. There were no other stevedores out there.
18  A. No.
19  Q. And the ship's -- was the ship's crew
20  actually hooking up loads or doing anything to
21  discharge the cargo?
22  A. No.
23  Q. And it was a member of Empire's gang that
24  was operating the cranes?
25  A. Uh-huh.

**80**

1  Q. Ship's cranes?
2  A. Uh-huh.
3  Q. And it was Empire's gear that was being
4  used, correct?
5  A. What I know, yes.
6  Q. It was Empire's spreader bar as far as you
7  know?
8  A. Uh-huh.
9  Q. It was Empire's chicken wires?
10  A. Uh-huh.
11  Q. Were there any problems with the ship's
12  crane?
13  A. I don't know nothing about that.
14  Q. Well, did the Empire crane operator ever
15  talk to you and say there's something wrong with
16  this crane?
17  A. No, sir.
18  Q. Did you ever see a problem with the crane?
19  A. No, sir.
20  Q. Do you carry a radio?
21  A. Yes.
22  Q. Does the crane operator have a radio?
23  A. Uh-huh.
24  Q. The crane operator never radioed you?
25  A. (Witness shakes head negatively.)

SANTOS ANTONIO CANALES ORTIZ - April 30th, 2010

**117**

1  Q. Okay. Is this generally how the chicken
2  wire would be attached to a load of rebar?
3  A. This is the way -- this is the way it's
4  supposed to be attached to the rebar right here.
5  Q. You're looking at the picture on the bottom.
6  A. I'm looking at the picture on the bottom.
7  Q. Okay. And on the picture on the bottom,
8  that shows the spreader bar, correct?
9  A. Uh-huh. Okay.
10 Q. And we can see four lines coming off of the
11 spreader bar down to the rebar.
12 A. Uh-huh.
13 Q. Now, in your complaint in the lawsuit, in
14 the paper that got filed for your lawsuit --
15 A. Uh-huh.
16 Q. -- it said that the method, the way this was
17 done was dangerous, it wasn't the proper way to do
18 this job. What would be the proper way to lift this
19 cargo?
20 A. Like that. The only thing, you don't want
21 the wire to pop.
22 Q. All right. So then what you're saying is
23 the problem was that the loops were popping.
24 A. You're right.
25 Q. That's the only problem.

**118**

1  A. That's the only problem.
2  Q. Is there another way to get rebar out of the
3  cargo hold?
4  A. I don't know.
5  Q. Have you ever seen another way to lift rebar
6  out?
7  A. No way. I only see put it out this way like
8  that.
9  Q. Have you ever seen slings used around the
10 ends of the rebar to lift them up that way?
11 A. You use the wires to do pipes. For rebar it
12 already comes made to do it this way.
13 Q. So this is the only way you've ever --
14 A. This is the only way I've seen it.
15 Q. And the loops that we have seen on the
16 pictures, that was already on the cargo when it got
17 to you.
18 A. You're right.
19 Q. The cargo that fell, did you see that cargo
20 being hooked up to the spreader bar before it fell?
21 A. Yeah. Used to be a hundred fifty feet in
22 the air.
23 Q. Right. But did you see --
24 A. No.
25 Q. -- other longshoremen hook it up?

**119**

1  A. I used to be on the top of the hold. I see
2  it before it got hooked. I don't see that specific
3  bundle get hooked there.
4  Q. That's my question --
5  A. No.
6  Q. -- did you see that specific bundle?
7  A. No.
8  Q. Okay.
9  A. I never there when the bundle got hooked up.
10 Q. Was there a procedure or a process for you,
11 the crewmembers, the longshoremen that you were in
12 charge of, to check the loops to make sure it was
13 strong enough to lift the bundles?
14 A. One way you can check?
15 Q. I'm asking you, is there a way to check it?
16 A. I don't know. Probably is a way to check it
17 but I don't know.
18 Q. Do you know for sure that the bundle that
19 fell on you, was it hooked up to one of the loops,
20 or hooked up to one of the straps that holds the
21 wires, the rebar together?
22 A. You ask me I know for sure?
23 Q. Yes.
24 A. No.
25 Q. You don't know.

**120**

1  A. I don't know.
2  Q. Okay. You said that Empire has whatever it
3  was that broke.
4  A. You're right.
5  Q. Who could I ask at Empire? How do I get
6  ahold of them to find that?
7  A. The superintendent, Frank. I don't know if
8  Frank is still working there because this happened
9  five years ago.
10 Q. Sure.
11 A. So he's the man you're supposed to be
12 asking, Frank.
13 Q. And Empire is still -- the office is still
14 where it was.
15 A. Uh-huh.
16 Q. And you think there may have been eight
17 bundles of rebar in that lift?
18 A. Between eight and four. That's all I can
19 tell you.
20 Q. Okay. And one -- as far as you know, one
21 loop broke.
22 A. You're right.
23 Q. All the other loops held.
24 A. Uh-huh.
25 Q. What kind of clothing were you wearing that

**125**

1  get hired today, you don't have a guarantee you get
2  hired tomorrow. There's not the same people working
3  every day.
4     Q. Sure. So the crane operator is not a
5  permanent --
6     A. It's not a permanent, no.
7     Q. Did you talk to the crane operator at any
8  time after this incident?
9     A. No.
10    Q. Did you talk to anybody else, not right that
11 day, but maybe --
12    A. After my accident?
13    Q. -- after your accident?
14    A. No.
15    Q. So you didn't talk to anybody who said, I
16 saw what happened, here's what I saw.
17    A. No.
18    Q. Have you seen any pictures other than what
19 I've shown you today?
20    A. No, ma'am.
21    Q. You haven't seen pictures about what the
22 cargo hold looked like after you were injured?
23    A. No, ma'am.
24    Q. Have you seen any other pictures of your
25 ankle or your foot that were taken after your

**126**

1  injury?
2     A. My doctor, yes.
3     Q. Your doctor has pictures?
4     A. Yeah. I got a DVD, all my surgery,
5  everything.
6     Q. You have that or your attorney has that?
7     A. I got that.
8        MR. LEGER, III:
9           You want to get that to me?
10       THE WITNESS:
11          Sure.
12    Q. (BY MS. BROUHARD) Not sure we want to see
13 it, but -- have you seen any other pictures that
14 have anything to do with your injury?
15    A. No.
16    Q. Did you look at anything today or within the
17 last several weeks to get ready for your deposition
18 today?
19    A. Like looking at what?
20    Q. Look at any pictures, or look at any pieces
21 of paper.
22    A. No.
23    Q. Any documents?
24    A. No.
25    Q. Now, in the complaint that your lawyers

**127**

1  filed in -- the formal piece of paper that they
2  filed in your lawsuit, it says that Arcelor, my
3  client, required bundles of rebar lifted by attached
4  lifting loops only with two cargo hooks attached to
5  spreader bar. And it looks to me like it's quoting
6  some language from some piece of paper, some
7  document. Did you give your lawyers some document
8  that you had gotten from the stevedore?
9     A. No, ma'am.
10    Q. Do you know where they might have gotten
11 that language?
12    A. No, ma'am.
13    Q. You didn't do any particular or special
14 testing of any of these loops --
15    A. No, ma'am.
16    Q. -- to make sure if they were strong enough?
17    A. I never did no tests.
18    Q. So the only reason you say that they were
19 insufficient is that some of them broke.
20    A. You're right.
21    Q. And you would agree that Empire could have
22 stopped work if they had thought the situation was
23 too dangerous?
24    A. I could stop the work.
25    Q. You could have stopped the work.

**128**

1     A. Yes.
2     Q. Okay. But you didn't.
3     A. Because I never think going to be danger.
4  I never knew can I get somebody in danger, you
5  know?
6     Q. Several times while you've been treating
7  over the last four years you've had physical
8  therapy.
9     A. Uh-huh.
10    Q. And it looks like from the records that when
11 you had the physical therapy your ankle would feel
12 better, is that right?
13    A. You're wrong.
14    Q. It never felt better?
15    A. Never felt better.
16    Q. Sometimes it looked like, at least they were
17 reporting that you got better movement.
18    A. Better movement is one thing, but the pain
19 is two different things.
20    Q. Okay. Did you get better movement of your
21 ankle?
22    A. You're right.
23    Q. Do you have good movement of your ankle now?
24    A. I don't really know what you call good
25 movement. I can move it better than what I used to

**Page 133**

MS. BROUHARD:
    Thank you very much. I appreciate it.
THE WITNESS:
    Thank you. Thanks
EXAMINATION BY MR. STARLING:
Q. Mr. Canales, my name is Gordon Starling and I represent American Shipping & Chartering Corporation.
    Now, you as the foreman thought that you could safely discharge this cargo; is that correct?
A. You're right.
Q. So there's nothing wrong with a party authorizing that this cargo be discharged, is that correct?
A. You're right.
Q. Now, when the accident happened, were you working overtime at that point?
A. No, sir.
Q. Was there anything that authorized -- if someone authorized overtime payments, was there anything improper or connected to your accident involved with authorizing overtime payments?
A. No, sir.
Q. In my understanding of your accident, the way your accident happened, this is the rebar.

**Page 134**

A. Uh-huh.
Q. One of the lifting wires broke on one side.
A. Uh-huh.
Q. The rebar fell, hit on its end.
A. Uh-huh.
Q. Onto the deck of -- the tank top of the hold.
A. Uh-huh.
Q. And then it fell over.
A. Fell over.
Q. And that's what hit you.
A. That's what hit me right there.
Q. When you were down there in the hold were you standing on the tank top? Had enough cargo been cleared that you were actually on the bottom of the hold?
A. No. I never got to the bottom yet.
Q. Okay. You were standing on --
A. Cargo.
Q. -- cargo.
A. Uh-huh.
Q. Now, you said that you were guaranteed forty thousand dollars a year.
A. Uh-huh.
Q. Which is equivalent of forty hours a week

**Page 135**

but you could make more with overtime.
A. You're right.
Q. Before your accident happened did you ever have an opportunity to make overtime?
A. Oh, yeah.
Q. How often would you ever make overtime, do you recall?
A. At that point in time after Katrina, normal everybody used to make overtime, at least fifty hours a week. Because you're working twelve hours a day.
MR. STARLING:
    All right. Thank you very much.
THE WITNESS:
    You're welcome.
EXAMINATION BY MR. PORTEOUS:
Q. I only have a few clarification type questions.
    My name is Thomas Porteous, I'm here on behalf of American Longshore Mutual Association.
    You said you underwent a voc rehab assessment here in your lawyer's office; is that correct?
A. What is voc rehab?
Q. Did you meet with a vocational

**Page 136**

rehabilitation person?
A. In Chalmette.
Q. In Chalmette.
A. Yeah.
Q. Who was that person?
MR. LaVIE:
    Bouterie's office.
A. That's a lady.
Q. (BY MR. PORTEOUS) That's a lady?
A. Yeah.
Q. Do you remember her name?
A. I don't remember his the name.
MR. LaVIE:
    I think it was in Bouterie's office, the other lawyer. Alan Bouterie's office.
MR. LaVIE:
    Is that where you met the voc rehab lady, at Mr. Bouterie's office?
THE WITNESS:
    Uh-huh. You're right.
Q. (BY MR. PORTEOUS) You mentioned, when talking about your current income, that you had spent some of your savings?
A. Uh-huh.
Q. Do you know how much you think you've spent?